**Nov 17, 2020**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: **20-20223-CR-MARTINEZ/BECERRA**

18 U.S.C. § 1343
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)(C)

## UNITED STATES OF AMERICA

vs.

## JASON ADAM OGDEN,

Defendant

_____ /

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment:

## The EB-5 Immigration Program

1.      The EB-5 Immigrant Investor Pilot Program ("EB-5") was created by Congress in 1990 to stimulate the United States economy through job creation and capital investment by foreign investors. The EB-5 immigrant investor program provided a path to permanent residency for qualifying foreign investors.  Under the program, which was administered by the United States Citizenship & Immigration Service ("USCIS"), foreign nationals were eligible to petition USCIS for a green card when they could show they had (1) invested $500,000 in a high unemployment or rural area (or $1 million in any area), (2) in a commercial enterprise, (3) that carried a risk of loss, and (4) that created at least ten full-time jobs for United States workers.

2.      Job creation under the EB-5 Program could be met through "direct jobs," such as jobs for employees who worked directly for the business created by the investment, or "indirect jobs," which were jobs typically created by businesses that supplied goods or services to the EB-5 business, such as construction services. From the investor's perspective, one of the most important aspects of an EB-5 investment was typically the ability for the investor to obtain a United States permanent resident card ("green card").

3.      Under the EB-5 Immigration Program, after a foreign investor made the necessary $500,000 investment, the foreign investor could petition USCIS for a conditional green card, which was valid for two years. As part of the USCIS application, the investor was required to submit an economic report that specified the number of jobs the investment was projected to create and whether those jobs were direct or indirect. Indirect jobs were estimated using a USCIS approved economic methodology.  To estimate the number of jobs created, the methodology took into consideration projected costs, such as construction costs for stores, associated with the investment and/or projected revenues resulting from the investment, and applied an employment multiplier that took into account the proposed project's location and industry.

4.      At the end of the two year conditional period, the EB-5 investor was allowed to request that USCIS issue a permanent green card.  In determining whether to grant the request for a permanent green card, USCIS considered, among other things, whether the actual project costs and/or revenues resulting from the EB-5 investment created the required ten jobs.

### The Corporations

5.      Yoblendz International, LLC ("Yoblendz") was a Florida corporation with its principal place of business in Broward County, Florida, and was purportedly in the business of franchising freestanding brick and mortar frozen yogurt stores.

2

6. Juiceblendz International, Inc. ("Juiceblendz") was a Florida corporation with its principal place of business in Broward County, Florida, and was purportedly in the business of franchising freestanding brick and mortar stores that offered dietary and nutritional supplements, beverages, and other products.

7. Blendz Holding, LLC. ("Blendz") was a Florida corporation with its principal place of business in Broward County, Florida, and was purportedly in the business of franchising freestanding brick and mortar and kiosk style juice and yogurt stores.

8. AJN Investments, LLC ("AJN") was a Florida corporation with its principal place of business in Broward County, Florida, and was purportedly in the business of using EB-5 investor money to build and operate Juiceblendz and Yoblendz stores for EB-5 foreign investors.

9. Seekem, Inc. ("Seekem") was a Florida corporation with its principal place of business in Broward County, Florida, and was the managing member of AJN.

### The Defendant

10. Defendant **JASON ADAM OGDEN** resided in Broward County, Florida, was Chief Executive Officer of Yoblendz, President of Juiceblendz and Yoblendz, President and CEO of Seekem, which was managing member of AJN, and controlled Yoblendz, Juiceblendz, Blendz, AJN, and Seekem.

### COUNTS 1-2
### WIRE FRAUD
### (18 U.S.C. § 1343)

1. Paragraphs 1 through 10 of the General Allegations section of this Indictment are realleged and fully incorporated herein by reference.

2. From in or around October 2011, through in or around October 2016, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JASON ADAM OGDEN,**

did knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate commerce, by means of wire communication, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was the purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by misappropriating investor money for their personal use and benefit by making material representations that were false and fraudulent when made, and concealing and failing to state material facts concerning, among other things, the safety and profitability of investing in AJN, Blendz, Yoblendz, and Juiceblendz, and the defendant's ability to produce viable EB-5 investment platforms.

## THE SCHEME AND ARTIFICE

The defendant and his accomplices sought to accomplish the scheme and artifice by, among other things, the following:

4.      Sometime in 2011, **JASON ADAM OGDEN** began offering investments in his yogurt and juice business to foreign investors and specifically touted his ability to use his business model to qualify as an EB-5 Immigration platform.  **OGDEN** offered these investments through various written and oral means, including Private Placement Memoranda ("PPM"), Franchise Agreements, and Confidential Business Overviews.

5.     **JASON ADAM OGDEN** personally solicited potential investors through a number of avenues, including conferences and road shows, networking with immigration attorneys and brokers (who posted **OGDEN** approved marketing materials on the internet), and subscribing to a website designed to match EB-5 offerings and investors. Several investors came to Broward and Miami-Dade County, Florida for visits and sales meetings with **OGDEN**.

6.     **JASON ADAM OGDEN** directed investors to make payments for the EB-5 investment by: (a) transferring funds electronically via interstate wires to bank accounts **OGDEN** controlled; or (b) mailing checks to **OGDEN's** office in Broward County, Florida.  **OGDEN** opened and controlled several bank accounts in which he deposited EB-5 investor funds.

7.     The EB-5 investments were not finalized until the investment documents and funds were received by **JASON ADAM OGDEN** in the United States.

8.     **JASON ADAM OGDEN**, through AJN's PPM, told investors that in exchange for a $550,000 subscription price, each investor would receive one unit of limited liability company membership interest in AJN, a 5% annual return on investment, and cash distributions from specific Juiceblendz or Yoblendz frozen yogurt franchise stores.  The PPM also stated that each investor would receive a franchise store and that one of **OGDEN's** companies would be responsible for maintaining separate books of account for each store in order to track that store's financial performance.

9.     Pursuant to the terms of the PPM, **JASON ADAM OGDEN**, through his companies Seekem and AJN, was entitled to receive a one-time $50,000 administrative fee per investor and an annual management fee.  Similarly, **OGDEN's** Franchise Agreement referenced the one-time $50,000 administrative fee.

10.     **JASON ADAM OGDEN's** PPM summarized the overall projected use of proceeds as "$400,000 store construction fee to cover store construction, equipment and opening expenses." For those investors that received a Juiceblendz EB-5 written business plan, **OGDEN** represented: "The entire $500,000 investment will be used to successfully establish the franchise store."

11.     The allocation of $400,000 to $500,000 for store construction was of particular importance to the EB-5 foreign investors because it formed the basis for estimating how many jobs a project would create under the EB-5 Immigration Program. The representation to USCIS that at least ten jobs per investor would be created by the AJN investment was based on the $400,000 to $500,000 allocation.

12.     The documents **JASON ADAM OGDEN** provided to his foreign investors also touted how his business model would meet the EB-5 economic impact requirements for certain South Florida counties. For example, the PPM included an estimate for the number of indirect jobs created per store. Using an average construction cost per store of $400,000 and average store revenues of $785,000 (a number in the range of estimated revenues for a Yoblendz or Juiceblendz store), the PPM concluded that just over twenty-four jobs would be created from the construction and operation of each store. Thus, according to **OGDEN's** offering materials, the AJN EB-5 investor should have easily exceeded the required minimum of ten jobs created.

13.     **JASON ADAM OGDEN** caused at least fifteen individual foreign investors to provide him over $7,000,000 to fund his claimed EB-5 Program, promising each investor one or more individual Yoblendz and/or Juiceblendz locations. And while **OGDEN** claimed past success in building out franchises for EB-5 investors, **OGDEN**, in truth and in fact, successfully completed few franchise stores for his EB-5 investors.

14.   Starting almost immediately after his first EB-5 investor contracted with him in or around October 2011, and continuing through at least in or around January 2016, **JASON ADAM OGDEN** misappropriated investor funds for purposes other than those disclosed to investors. Instead of using his EB-5 investor proceeds to successfully establish franchise stores, **OGDEN** used their proceeds for, among other things, monetary distributions to himself, to his sales agents, and other people he hired.  In addition to misappropriating investor funds to cover unrelated or undisclosed business expenses and liabilities, **OGDEN** used at least $4 million of the investors' funds for his own personal benefit, including for undisclosed cash payments, meals, jewelry, luxury vehicles, private jets and helicopters, entertainment, and to repay personal loans.

15.   **JASON ADAM OGDEN** used his EB-5 investor funds to the detriment of both the foreign investors' financial position and EB-5 visa eligibility.  By failing to use investor funds for construction costs as contemplated by the offering materials and by failing to meet the unrealistic revenue projections underlying the economic impact analyses, **OGDEN** eliminated his EB5 investors' ability to create the necessary jobs to obtain a green card under the EB-5 program. Based on **OGDEN's** misappropriation of investor funds, none of his EB-5 investors successfully obtained a green card.

16.   To induce investors to provide money to the defendant and his accomplices, **JASON ADAM OGDEN** and his accomplices made and caused others to make numerous materially false and fraudulent statements to investors, including, among other things, the following:

**Materially False Statements**

(a)   that between $400,000 and $500,000 from each EB-5 investor would be used to successfully establish a job-creating franchise store;

(b)     that the defendant's EB-5 Program would successfully afford his investors an

opportunity to receive an EB-5 visa and ultimately a green card;

(c)     that the EB-5 investor funds would be placed in an escrow account;

(d)     that investor funds would be returned if no franchise was produced to the investor;

and

(e)     that the franchises were successful and profitable.

**USE OF THE WIRES**

17.     On or about the dates enumerated below, the defendant, for the purpose of

executing and in furtherance of the scheme and artifice to defraud and to obtain money and

property by means of materially false and fraudulent pretenses, representations, and promises,

knowing the pretenses, representations, and promises were false and fraudulent when made, did

transmit and caused to be transmitted by wire some communication in interstate commerce to help

carry out the scheme to defraud, according to the directions thereon, as more particularly described

below:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 1 | November 18, 2015 | Investor A. wired $277,461.78 from a bank account located in Johannesburg, South Africa to a Blendz Holding, LLC bank account located in Broward County, Florida |
| 2 | November 18, 2015 | Investor A. wired $ 247,538.22 from a bank account located in Johannesburg, South Africa to a Blendz Holding, LLC bank account located in Broward County, Florida |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS 3-4
### Money Laundering
### (18 U.S.C. § 1956(a)(1)(B)(i))

On or about the dates specified as to each count below, in Miami-Dade and Broward Counties, in the Southern District of Florida, and elsewhere, the defendant,

**JASON ADAM OGDEN,**

as specified in each count below, did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that such transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as set forth below:

| Count | Approximate Date of Transaction | Description of Financial Transaction |
|-------|--------------------------------|--------------------------------------|
| 3 | 12/28/2015 | Transfer of approximately $47,000 via wire transfer from a Blendz Holding, LLC Bank of America account to a Blendz Holding, LLC Wells Fargo Bank account |
| 4 | 1/1/2016 | Transfer of approximately $10,000 via wire transfer from the account of **JASON ADAM OGDEN** to M.O, his wife |

It is further alleged that the specified unlawful activity is wire fraud, in violation of Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## FORFEITURE
### (18 U.S.C. §§ 981(a)(1)(C)) and 982(a)(1)(c))

1.      The allegations of this Indictment are re-alleged, and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendant, **JASON ADAM OGDEN**, has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 1343, as alleged in this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

3.      Upon conviction of a violation of Title 18, United States Code, Section 1956, as alleged in this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1)(C), any property, real or personal, involved in such violation, or any property traceable to such property.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), as made applicable by Title 28, United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(1)(C), and the procedures set forth at Title 21, United States Code, Section 853.

A TRUE BILL

FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

ROGER CRUZ
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

Jason Adam Ogden

_____ Defendant. _____ /

CASE NO._____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

New defendant(s)　　　　　Yes ____　No ____
Number of new defendants　____
Total number of counts　____

**Court Division:** (Select One)

| ✓ | Miami | __ | Key West |
| __ | FTL | __ | WPB | __ | FTP |

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:　(Yes or No)　No ____
   List language and/or dialect　_____

4. This case will take __5__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

| (Check only one) | | | | (Check only one) | | |
|---|---|---|---|---|---|---|
| I | 0 to 5 days | ✓ | | Petty | | |
| II | 6 to 10 days | | | Minor | | |
| III | 11 to 20 days | | | Misdem. | | |
| IV | 21 to 60 days | | | Felony | ✓ | |
| V | 61 days and over | | | | | |

6. Has this case previously been filed in this District Court?　(Yes or No)　No
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?　(Yes or No)　No
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____

   Is this a potential death penalty case? (Yes or No)　No

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?　Yes ____　No ✓

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?　Yes ____　No ✓

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?　Yes ____　No ✓

_____
ROGER CRUZ
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 157971

*Penalty Sheet(s) attached

REV 6/5/2020

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** JASON ADAM OGDEN

**Case No:** _____

Counts #: 1-2

Wire Fraud

Title 18, United States Code, Section 1343

**\* Max. Penalty:**          Twenty (20) years' imprisonment, as to each count

Counts #: 3-4

Money Laundering

Title 18, United States Code, Section 1956(a)(1)(B)(i)

**\*Max. Penalty:**          Twenty (20) years' imprisonment, as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,
special assessments, parole terms, or forfeitures that may be applicable.**